UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENT LEROY CHILDS,          Civil Action No.: 17-12482
                            Honorable Linda V. Parker
                Plaintiff,  Magistrate Judge Elizabeth A. Stafford

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 15, 20]

Plaintiff Kent Leroy Childs appeals the final decision of defendant Commissioner of Social Security (Commissioner), which denied his application for disability insurance benefits (DIB) under the Social Security Act.  Both parties have filed summary judgment motions, referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  After review of the record, the Court **RECOMMENDS** that:

- the Commissioner's motion [ECF No. 20] be **GRANTED**;

- Childs's motion [ECF No. 15] be **DENIED**; and

- the Commissioner's decision be **AFFIRMED**, pursuant to sentence four of 42 U.S.C. § 405(g).

## I.   BACKGROUND

### A.   Childs' Background and Disability Applications

Born May 21, 1958, Childs was 57 years old, which is described as an individual of advanced age, on the date last insured (DLI), December 31, 2015.  [ECF No. 11-2, Tr. 36].  Childs has a limited education, only completing the seventh grade, but he is able to communicate in English. [*Id.*; ECF No. 11-6, Tr. 198].  During the administrative proceedings, Childs amended his alleged onset date to May 21, 2013.  [ECF No. 11-5, Tr. 192]. Childs alleges a disability due mainly to bilateral shoulder pain, shortness of breath, fatigue, and difficulty concentrating.  [ECF No. 11-6, Tr. 214].

After a hearing on August 9, 2016, during which Childs and a vocational expert (VE) testified, the ALJ found that Childs was not disabled at any time from the amended alleged onset date through the DLI.  [ECF No. 11-2, Tr. 38].  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. [ECF No. 11-2, Tr. 1-9]. Childs timely filed for judicial review.  [ECF No. 1].

### B.   The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

2

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A).

The Commissioner determines whether an applicant is disabled by

analyzing five sequential steps. First, if the applicant is "doing substantial

gainful activity," he or she will be found not disabled. 20 C.F.R. §

404.1520(a)(4). Second, if the claimant has not had a severe impairment

or a combination of such impairments[1] for a continuous period of at least

12 months, no disability will be found. *Id.* Third, if the claimant's severe

impairments meet or equal the criteria of an impairment set forth in the

Commissioner's Listing of Impairments, the claimant will be found disabled.

*Id.* If the fourth step is reached, the Commissioner considers its

assessment of the claimant's residual functional capacity (RFC), and will

find the claimant not disabled if he or she can still do past relevant work.

*Id.* At the final step, the Commissioner reviews the claimant's RFC, age,

education and work experiences, and determines whether the claimant

could adjust to other work. *Id.* The claimant bears the burden of proof

throughout the first four steps, but the burden shifts to the Commissioner if

---

[1] A severe impairment is one that "significantly limits [the claimant's]
physical or mental ability to do basic work activities." § 1520(c).

3

the fifth step is reached. *Preslar v. Sec'y of Health & Human Servs.*, 14

F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Childs was not

disabled. [ECF No. 11-2, Tr. 38]. At the first step, she found that Childs

had not engaged in substantial gainful activity during the relevant period.

[ECF No.11-2, Tr. 24]. At the second step, she found that Childs had the

severe impairments of status post-surgical correction of shoulder tears and

ischemic heart disease. [*Id.*] Next, the ALJ concluded that none of Childs's

impairments, either alone or in combination, met or medically equaled the

severity of a listed impairment. [*Id.*, Tr. 28-29].

Between the third and fourth steps, the ALJ found that through the

last day insured, Childs had the RFC to perform medium work,[2] with the

following limitations:

> [He could] lift and/or carry up to 25 pounds frequently and 50
> pounds occasionally. He could stand and/or walk for up to six

---

[2] "The regulations define medium work as lifting no more than 50 pounds
at a time with frequent lifting or carrying of objects weighing up to 25
pounds. A full range of medium work requires standing or walking, off and
on, for a total of approximately 6 hours in an 8-hour workday in order to
meet the requirements of frequent lifting or carrying objects weighing up to
25 pounds. As in light work, sitting may occur intermittently during the
remaining time. Use of the arms and hands is necessary to grasp, hold,
and turn objects, as opposed to the finer activities in much sedentary work,
which require precision use of the fingers as well as use of the hands and
arms." *Titles II & Xvi: Determining Capability to Do Other Work-the Med.-
Vocational Rules of Appendix 2*, SSR 83-10 (S.S.A. 1983).

> hours and sit for up to six hours during an eight-hour workday.
> The claimant could reach overhead bilaterally frequently.  He
> could frequently climb ladders, ropes and scaffolds; and crawl.

[ECF No. 11-2, Tr. 29].  At step four, the ALJ found that Childs was capable

of performing his past relevant work as an operating engineer.  [*Id.*, Tr. 36].

And the ALJ determined at the final step that Childs was capable of

performing other jobs that existed in significant numbers—including

positions as an order picker, production helper, and food service worker—

after considering his age, education, work experience, RFC, and the

testimony of the VE.  [*Id.*, Tr. 37].  As such, the ALJ concluded that Childs

was not disabled at any time from the amended alleged onset date, through

the date last insured.  [*Id.*, Tr. 38].

## II.   ANALYSIS

Pursuant to § 405(g), this Court's review is limited to determining

whether the Commissioner's decision is supported by substantial evidence

and was made in conformity with proper legal standards.  *Gentry v. Comm'r*

*of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).  Substantial evidence is

"more than a scintilla of evidence but less than a preponderance; it is such

relevant evidence as a reasonable mind might accept as adequate to

support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241

(6th Cir. 2007) (internal quotation marks and citation omitted).  Only the

5

evidence in the record below may be considered when determining whether the ALJ's decision is supported by substantial evidence.  *Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007).

Childs argues that the RFC assessment does not accurately portray his physical and mental impairments, and that the ALJ failed to give proper weight to his treating physician's medical source statement.  Childs also claims that new and material evidence exists requiring a remand under sentence six of Section 405(g).  For the reasons that follow, the Court concludes that substantial evidence supports the ALJ's RFC finding, that there was no error in weighing the opinion evidence, and that Childs has not met the standard for remand under sentence six.

**A.**

Childs first argues that substantial evidence fails to support the ALJ's RFC determination that he was capable of "medium work" with limitations.[3]

---

[3]  As noted by the Commissioner, although Childs alleges that the RFC does not accurately portray his physical *and mental* impairments, he does not develop any argument with respect to the ALJ's mental capacity conclusions.  As such, any challenge in that regard has been waived.  "It is well-established that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argument, are deemed waived."  *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005) (internal quotation marks and citation omitted); *see also Bishop v. Gosiger, Inc.*, 692 F.Supp.2d 762, 774 (E.D. Mich. 2010) ("It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the

[ECF No. 11, PageID.1131-35]. The Commissioner counters that the RFC properly accounts for Childs's shoulder impairments. A claimant's RFC assesses his ability to do sustained work-related activities in a work setting on a regular and continuing basis, *i.e.,* eight hours a day, five days a week. *Meece v. Barnhart*, 192 F. App'x 456, 466 (6th Cir. 2006). Here, the ALJ concluded that Childs had the RFC to perform a limited range of medium work. [ECF No. 11-2, Tr. 29]. In making this finding, the ALJ concluded:

> Objective medical evidence shows the claimant's impairments produced documented symptoms; however, his allegations of disabling conditions during the relevant period under review are generally overstated. First, a left shoulder surgical procedure greatly improved his functioning in that shoulder. Additionally, there is little evidence that the claimant consistently complained of right shoulder pain. . . . The undersigned considered the entire record, including the objective medical evidence, the claimant's subjective statements and opinion evidence, in accommodating his impairments within his residual functional capacity. In summary, the claimant was able to perform both his past relevant work and other work in the national economy within the parameters of this assessment.

[ECF No. 11-2, Tr. 30]. The Court finds that substantial evidence supports these findings.

The ALJ conducted a comprehensive examination of the evidence regarding Childs's status post-surgical correction for shoulder tears. [ECF

---

court to put flesh on its bones.") (internal quotation marks and citations omitted).

No. 11-2, Tr. 30-32].  She noted that Childs fell off a ladder at work in April 2012, resulting in an injury to his right shoulder.  [ECF No. 11-2, Tr. 30]. He subsequently underwent surgery in May 2012 to repair his right rotator cuff.  [ECF No. 11-7, Tr. 331].  During a December 2012 follow-up, Childs's surgeon, B. Max Iverson, M.D., indicated that Childs had essentially full range of motion passively and actively of the right shoulder.  [*Id.*].  Dr. Iverson noted that Childs still lacked some strength to abduction and external rotation maneuvers involving the right arm, but there was no palpable pain at the shoulder, and Childs reported that his strength was "improved quite a bit," and that his range of motion was better.  [*Id.*]  Childs also indicated that "[p]ain is not much of a problem for him at this point in time."  [*Id.*]  Dr. Iverson noted that Childs was "clearly doing better" and recommended that Childs could increase his overall activity, including using the right arm.  Dr. Iverson concluded that Childs "more likely than not, is not to have any significant residual problem."  [*Id.*, Tr. 331-32].

In 2015, Childs showed pain on abduction and external rotation. [ECF No. 11-8; Tr. 557].  Though Childs mentioned that his right shoulder was bothering him, provider notes from this time show that he infrequently complained of right shoulder pain.  [ECF No. 11-10; Tr. 788, 795, 799, 801, 804-06, 807, 811].  He did complain of needing a stronger prescription of

Norco, but that was immediately after his January 2014 left surgical procedure.  [ECF No. 11-10, Tr. 816].

Regarding Childs's left shoulder, the ALJ reviewed the objective medical evidence including a June 2014 x-ray, a July 2014 radiograph, and a November 2014 magnetic resonance image (MRI), together with Waheed Akbar, M.D.'s diagnosis of left rotator cuff tear.  [ECF No. 11-7, Tr. 393-94]. Childs took Hydrocodone and Norco for pain, and received a steroid injection, which he reported helped his pain level.  Childs also underwent physical therapy in 2014, though he claimed that it made the pain in his shoulder worse.  [ECF No. 11-7, Tr. 469; ECF No. 11-8, Tr. 476, 505].  The ALJ noted that Childs complained of bilateral shoulder pain during this time, though Dr. Akbar surmised that his left shoulder pain was due to overcompensating with that shoulder.  [ECF No. 11-7, Tr. 392-93].  Despite Childs's complaints of pain, examinations during this time showed a normal range of motion in his extremities, including an August 2014 examination of his left shoulder which showed an overall satisfactory range of motion. [ECF No. 11-7, Tr. 344, 393, 443].  In October 2014, Dr. Akbar noted that Childs had overall improvement in his bilateral shoulder pain.  [ECF No. 11-7, Tr. 406-07].  Although Dr. Akbar offered Childs treatment options to treat his pain, including acromioplasty, Childs indicated that he felt "much

9

improved" and did not want further intervention.  [*Id.*]  But Childs did undergo an acromioplasty and bony reattachment of the left shoulder in December 2014.  [ECF No. 11-8, Tr. 503].

Following his surgery, medical records show that Childs's left shoulder pain and mobility improved.  [ECF No. 11-8, Tr. 550-51, 553-54, 556-57, 594; ECF No. 11-9, Tr. 771].  Dr. Akbar noted in February 2015 that Childs remarked that he was "very happy with the improvement"; he noted in April 2015 that Childs's left shoulder "clinically is quite benign," that his range of motion was 90%+ of normal; and he noted in June 2015 that Childs had "overall healed satisfactorily" and had no distal neurovascular deficits and would only be seen as again as needed.  [ECF No. 11-8, Tr. 551, 554, 594].  Dr. Akbar described Childs as being comfortable during examinations at each of those visits.  [*Id.*].  Childs's physical therapist similarly noted in March 2015 that his range of motion was within functional levels, that his pain was tolerable, and that he would continue therapy to gain strength.  [ECF No. 11-9, Tr. 648].

The ALJ further noted that Sarah Bancroft-Treadway, M.D., a state agency consultant, reviewed records from June 2014 until the date of her opinion, November 7, 2014, and concluded that Childs was suited for

medium exertional level work.  [ECF No. 11-2, Tr. 33-34, citing ECF No. 11-3, Tr. 98-113].

The ALJ also addressed Childs's alleged "fairly limited" daily activities, and found that they did not provide strong evidence that he was disabled.  [ECF No. 11-2, Tr. 33].  Her first reason—that Childs's allegations of limited daily activities could not be objectively verified with any reasonable certainty—is not well-taken.  [*Id.*]  The Court is not aware of any requirement that claimants provide objective verification of their daily activities.

The ALJ's second reason is more persuasive.  She found that, even if Childs's daily activities were as limited as he alleges, "it was difficult to attribute that degree of limitation to [Childs's] medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in [the] decision."  [*Id.*]  As described by the ALJ, Childs had alleged that he could not reach above his head; that he had no grip; that he could not lift anything heavier than a gallon of milk; that he had difficulty standing and sitting; and that he could only walk 50 yards without needing to rest.  [*Id.*, Tr. 30, 73-76; ECF No. 11-6, Tr. 219].  The ALJ's conclusion that these alleged limitations are not sustained by the

medical evidence is supported by the substantial evidence she cites in her decision.

The ALJ also noted that Childs reported to his physical therapist that he was able to use a paint roller for short periods (February 19, 2015), work on his shed (February 26, 2015), and rake (April 23, 2015).  [ECF No. 11-9, Tr. 627, 628, 635].  She found these reported capabilities to be inconsistent with his allegations of disabling symptoms.  [ECF No. 11-2, Tr. 33]. Admittedly, Childs did not tell the physical therapist that he was performing the specified activities to an extensive degree, but his ability to use a paint roller, work on his shed and rake is inconsistent with his testimony that he has no grip, for example.

Childs points to statements within his records that he believes demonstrate that he was not capable of performing medium work.  For example, in December 2015, Childs reported to a physical therapist that his shoulders were not as strong as before.  [ECF No. 15, PageID.1133, citing ECF No. 11-9, Tr. 771].  His right shoulder was bothering him in January 2015.  [ECF No. 15, PageID.1133, citing ECF No. 11-8, Tr. 557].  And Childs rated his pain in his left shoulder as "4-5/10" in April 2015. [ECF No. 15, PageID.1133, citing ECF No. 11-8, Tr. 550].  Childs also focuses on a report of his physical therapist, Gurcan Uremek, PT, PhD, whose July 2015

12

discharge report stated that Childs could tolerate no more than "4 pounds of resistive exercises" on his dominant left shoulder.  [ECF No. 11-10, Tr. 827].  PT Uremek also reported that Childs scored 38% on the Penn Shoulder Disability scale.[4]  [*Id.*]

Childs's argument that the ALJ failed to discuss specific complaints and findings within the medical records is without merit.  "[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."  *Simons v. Barnhart,* 114 F. App'x 727, 733 (6th Cir. 2004) (citation and internal quotation marks omitted).  "Rather, the key for meaningful judicial review is the requirement that an ALJ identify and discuss only such substantial evidence and good reasons as would support any determination made."  *Sito v. Comm'r of Soc. Sec.*, 229 F. Supp. 3d 633, 644 (N.D. Ohio 2017).  The ALJ here cited to each medical record on which the complaints and findings Childs cites were documented, suggesting that she considered those complaints and findings.  [ECF No. 11-2, Tr. 30-32].

---

[4]  The Penn Shoulder Score is a patient-reported outcome measure for the shoulder used to evaluate a patient's pain, current satisfaction level with their shoulder, and the joint's overall functionality.
https://www.codetechnology.com/penn-shoulder-score-tool/

Another cardinal rule is that the Court must uphold the ALJ's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley v. Comm'r of Soc. Sec.*, 581 3d. 399, 406 (6th Cir. 2009) (citation and internal quotation marks omitted). Here, the ALJ cited substantial evidence in support of her RFC determination, and the isolated statements upon which Childs relies are insufficient for him to sustain his burden of demonstrating that he requires a more restrictive RFC. *Preslar*, 14 F.3d at 1110 (claimant bears burden during first four steps).

## B.

Childs next argues that the ALJ failed to properly evaluate the opinion of his treating physician, Naveed Mahfooz, M.D.  The "treating physician rule" requires an ALJ to give controlling weight to a treating physician's opinions regarding the nature and severity of a claimant's condition when those opinions are well-supported by medically acceptable clinical and diagnostic evidence, and not inconsistent with other substantial evidence. *Gentry*, 741 F.3d at 723, 727-29; *Rogers*, 486 F.3d at 242-43.  "Even when not controlling, however, the ALJ must consider certain factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the

14

physician; and any other relevant factors," and give appropriate weight to the opinion. *Gentry*, 741 F.3d at 723. In all cases, a treating physician's opinion is entitled to great deference. *Id.*

While the Commissioner generally gives more weight to the medical opinion of a treating source, it can reduce the weight afforded where the opinion is not supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with the other substantial evidence in the claimant's record. *See* 20 C.F.R. § 404.1527(c)(2). Here, substantial evidence supports the ALJ's decision to afford partial weight to Dr. Mahfooz's opinion.

In a medical source statement dated June 2016, Dr. Mahfooz indicated that Childs had a reduced range of motion, and right-sided muscle weakness in the shoulder, weak grip strength and shoulder pain. [ECF No. 11-9, Tr. 764-75]. Dr. Mahfooz noted that Childs's prescribed medication (Norco) may cause dizziness, drowsiness or reduced concentration. [*Id.*, Tr. 764]. He opined that Childs would be able to use his right extremity for occasional (one-third of an 8-hour workday) grasping, reaching overhead and pushing/pulling, but did not opine on the

functionality of Childs's left extremity.[5]  [*Id.*]  Dr. Mahfooz also indicated that on average, he anticipated that Childs's impairments or treatments would cause him to be absent about two times per month.  [*Id.*, Tr. 765].

The ALJ gave good reasons for discounting Dr. Mahfooz's opinion; she concluded that the opinion was not consistent with the evidence as a whole.  *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  For example, in December 2012, well before Childs's alleged onset date, treating physician Max Iverson, M.D., observed that Childs had "no palpable pain" in his right shoulder and "essentially full" range of motion, was only lacking "a little bit" of strength to abduction and external rotation, and would likely have no significant residual problems.  [ECF No. 11-2, Tr. 30; ECF No. 11-7, Tr. 331].  While the ALJ recognized that Dr. Iverson's opinion was short-term in nature and was formed prior to Childs's

_____

[5]On his form statement, Dr. Mahfooz did not check any of the boxes for the left upper extremity when questioned about Childs's ability to occasionally use his arms one-third of an eight-hour workday.  [ECF No. 11-9, Tr. 764]. Childs suggests that Dr. Mahfooz was impliedly opining that Childs could not use his left upper extremity even occasionally.  But a more reasonable conclusion is that Dr. Mahfooz intended only to render an opinion about Childs's right shoulder impairment, as his diagnoses were "chronic right shoulder pain" and "severe right shoulder injury," and he referred to "right" shoulder pain and weakness, and right weak grip strength, while never mentioning any symptoms on the left shoulder.  [*Id.*, Tr. 764-65].

amended alleged onset date, he gave it some weight.  [ECF No. 11-2, Tr. 24].

Similarly, the ALJ gave partial weight to opinion of treating physician Terrence J. Cherwin, D.O., (also formed prior to Childs's amended onset date), and considered it evidence in favor of a restriction that Childs could reach overhead frequently.  [ECF No. 11-2, Tr. 34].  In January 2013, Dr. Cherwin opined that Childs was to avoid "aggressive" overhead activities and pull starting an engine.  [ECF No. 11-2, Tr. 34; ECF No. 11-7, Tr. 341]. His opinion was supported by a physical examination of Childs that showed tenderness in the anterior aspect of his right shoulder, no gross evidence of atrophy, and a positive impingement sign.  [*Id.*]

The ALJ also noted that Dr. Mahfooz's opinion was inconsistent with Dr. Akbar's treatment records, which repeatedly noted that Childs was doing well following his left shoulder procedure, had normal range of motion, and was comfortable.  [*Id.*; ECF No. 11-8, Tr. 551, 554, 557, 594]. Similarly, Childs did not regularly complain of right shoulder pain following his procedure in 2012, only occasionally telling medical providers that his right shoulder was bothering him.  [ECF No. 11-2, Tr. 35; ECF No. 11-7, Tr. 392-93].  In fact, Dr. Akbar observed in October 2014 that Childs's right shoulder bothered him only "at extremes," and there was no indication that

17

Childs reported any ongoing right shoulder pain at his appointment the next month.  [ECF No. 11-7, Tr. 407; ECF No. 11-8, Tr. 560].

Subsequently, Dr. Akbar noted in January 2015 that injection treatment might be appropriate "if [Childs's] right shoulder continues to bother him"; however, Childs did not report continuing shoulder issues to Dr. Akbar at appointments in February, April, and June of 2015.  [ECF No. 11-8, Tr. 551, 554, 594].  In fact, as the ALJ noted, Childs did not report any right shoulder pain to any primary care physician from January 2015 until December 2015.  [ECF No. 11-2, Tr. 35; ECF No. 11-10, Tr. 795, 799, 801, 804-06, 812, 816].  The ALJ also considered evidence that in December 2015 Childs reported to his chiropractor that his shoulders were "not hurting."  [ECF No. 11-2, Tr. 31; ECF No. 11-9, Tr. 771].

The ALJ also cited Dr. Bancroft-Treadway's assessment that the record from June to November 2014 supported an RFC for medium exertional level work.  [ECF No. 11-3, Tr. 98-113].  She opined that Childs could occasionally climb ladders, ropes or scaffolds, and crawl, and could occasionally reach overhead bilaterally.  [*Id.* at Tr. 107-08].  The ALJ gave Dr. Bancroft-Treadway's opinion "great weight" to the extent it supported an RFC for medium exertional work with additional limitations.  It appears that the ALJ concluded that Dr. Bancroft-Treadway's undercut Dr. Mahfooz's

18

opinion, [ECF No. 11-2, Tr. 35], which is inconsistent with the general rule that treating physician's opinions are given greater weight than opinions from non-examining sources.

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), [20 C.F.R.] § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir.2013). But having cited other good reasons to discount the weight given to Dr. Mahfooz's opinion, the ALJ was entitled to rely on Dr. Bancroft-Treadway's opinion to craft Childs's RFC.

Childs argues that the ALJ impermissibly relied on Dr. Bancroft-Treadway's opinion because she "was obviously unaware that [Childs's] left shoulder was much worse that first anticipated" as Childs had surgery one month after she issued her opinion. [ECF No. 15, PageID.1137]. But Dr. Bancroft-Treadway's assessment of occasional limitations was based on the evidence *before* Childs's shoulder was surgically corrected, and he improved post-surgery. [ECF No. 11-2, Tr. 33-34]. Childs acknowledged improvement in his left shoulder, but claims that he remained extremely

19

weak.  But as noted above, substantial evidence supports the ALJ's

assessment of his RFC, and the Court must affirm even if there is evidence

that supports an opposite conclusion. *Blakley,* 581 3d. at 406

Childs emphasizes the portion of Dr. Mahfooz's opinion that his

impairments would cause him to be absent about twice a month, but that

was not a medical opinion to which the ALJ was required to defer.  *Stojic v.*

*Comm'r of Soc. Sec.*, No. 1:14-CV-1133, 2015 WL 9238986, at *4 (W.D.

Mich. Dec. 17, 2015) (doctor's "predictions of how often Plaintiff would

likely be off task and miss work were conjecture, not a medical opinion");

*Morgan v. Comm'r of Soc. Sec.*, No. CV 15-12988, 2016 WL 5402940, at

*9 (E.D. Mich. July 15, 2016), *adopted*, No. 15-12988, 2016 WL 5369616

(E.D. Mich. Sept. 26, 2016) (prediction that claimant will miss work or be off

task not a medical opinion entitled to deference); *Skinner v. Comm'r of Soc.*

*Sec.*, No. CV 15-12368, 2016 WL 7856434, at *11 (E.D. Mich. Dec. 16,

2016), *adopted*, 2017 WL 227955 (E.D. Mich. Jan. 19, 2017) (same).

The Court also rejects Childs's contention that the ALJ erred by not

considering the evidence in accordance with 20 C.F.R. § 404.1527.  To

give good reasons, an ALJ need not provide an "exhaustive factor-by-factor

analysis."  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th

Cir. 2011).  The rule "is not a procrustean bed, requiring an arbitrary

20

conformity at all times." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).  Here, the ALJ gave good reasons for the weight given to the medical opinions of record, permitting a meaningful review of the decision.  *Rogers*, 486 F.3d at 243.

## C.

Lastly, Childs asks the Court for a sentence six remand based on a January 2017 statement from Dr. Mahfooz in which he opines that the ALJ erred in finding that Childs was capable of performing medium work with additional limitations as set forth by the RFC.  [ECF No. 15, PageID.1145].

Sentence six of the Act permits remand only where a subsequent adjudicator is presented with "*new* evidence which is *material* and that there is *good cause* for the failure to incorporate such evidence in to the record in a prior proceeding."  42 U.S.C. § 405(g) (emphasis added).  Dr. Mahfooz's January 2017 statement is considered "*new*" as "it was 'not in existence or available to the claimant at the time of the administrative proceeding.'"  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002) (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990)).

With respect to the "good cause" requirement, the Sixth Circuit "has taken a harder line" and requires a claimant to "give a valid reason for his failure to obtain evidence prior to the hearing."  *Oliver*, 804 F.2d at 966.

The good cause requirement is met when new evidence arises from continuing medical treatment, not when the evidence was "generated merely for the purpose of attempting to prove disability."  *Koulizos v. Sec'y of Health & Human Servs.*, 802 F.2d 458 (6th Cir. 1986); *see also Jackson v. Comm'r of Soc. Sec.,* No. 12-15036, 2014 WL 1304913 (E.D. Mich. Mar. 31, 2014) (citing *Koulizos*).

Childs does not establish good cause because Dr. Mahfooz's January 2017 statement was not generated because of continuing medical treatment, but merely for the purpose of attempting to prove disability. Contrary to reflecting continuing treatment, Dr. Mahfooz's January 2017 statement looked backward; he answered a question about Childs's right shoulder pain following his December 2014 surgery, and he explained his rationale for opining in June 2016 that Childs would miss work for up to two days a month.  [ECF No. 15, PageID.1145].   Dr. Mahfooz did not describe any continuing treatment, or even indicate that he was continuing to treat Childs.  Thus, Childs's request for remand for consideration of Dr. Mahfooz's January 2017 statement is wholly without merit.

## III.   CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that the Commissioner's motion [ECF No. 20] be **GRANTED**; that Childs's motion

[ECF No. 15] be **DENIED** and that the Commissioner's decision be

**AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford

ELIZABETH A. STAFFORD

Dated: August 3, 2018                    United States Magistrate Judge

## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this

Report and Recommendation, but must act within fourteen days of service

of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ.

P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any

further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v.

Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*,

638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party

might have to this Report and Recommendation.  *Willis v. Secretary of

HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers

Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

23

service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 3, 2018.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager